**The court incorporates by reference in this paragraph and adopts as the findings and orders
of this court the document set forth below. This document has been entered electronically in
the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: September 12 2025

Mary Ann Whipple
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 24-32206 |
| | ) | |
| Joshua M. Schmidt | ) | Chapter 13 |
| | ) | |
| Debtor(s) | ) | JUDGE MARY ANN WHIPPLE |

### ORDER RE: DEBTOR'S OBJECTION TO CLAIM

This case is before the court for decision after evidentiary hearing on Debtor's Objection to Proof of Claim Filed by Harley-Davidson Credit Corp. (Claim No. 2) [Doc. # 20] ("Objection"). Harley-Davidson Credit Corp.'s ("Harley-Davidson") claim is filed as fully secured, with both the amount of the debt and the amount secured stated as $11,874.26. [Ex. E, Claim No. 2-1]. The collateral for the debt is Debtor's 2018 Harley Davidson FLHXS Street Glide S ("motorcycle"). The basis of Debtor's Objection is that it is not a secured claim because the motorcycle went missing and therefore has zero value. Specifically, "Debtor does not believe that the amount claimed by Harley-Davidson Credit Corp. is a secured loan, or a purchase money security interest loan, as the collateral was stolen and is not in the possession of Debtor through no fault of his own." [Doc. # 20].

The district court has jurisdiction over this Chapter 13 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings involving allowance or disallowance of claims are core proceedings that the court may hear and determine under 28 U.S.C. § 157(b)(1) and (b)(2)(B).

# I. FACTS

**A. Debtor's Bankruptcy Cases**

The procedural background of this case is important.[1] Debtor filed this Chapter 13 case on November 12, 2024. It followed closely after his Chapter 7 Case No. 24-31046 filed in this court on June 4, 2024. The court entered Debtor's Chapter 7 discharge in that case, without objection, on September 11, 2024. No creditor sought to except any debt from Debtor's Chapter 7 discharge. Determined by the Chapter 7 trustee to be a no asset case, the Clerk routinely administratively closed Debtor's Chapter 7 case on September 17, 2024.

Debtor listed the motorcycle as an asset on his Schedule A/B Property in the Chapter 7 case, stating both the current value of the property and the current value of the portion he owns as "$0.00." [Case No. 24-31046, p.11/55]. Debtor listed Harley-Davidson on his Schedule D: Creditors Who Have Claims Secured by Property, stating the amount of the claim without deducting the value of the collateral as $12,000.00, the value of the collateral as $0.00 and the unsecured portion of the claim as $12,000.00. [Case No. 24-31046, p.18/55]. Debtor did not identify on his Statement of Financial Affairs any seizures of property or loss of property due to theft within the one year preceding the filing of the case. [Case No. 24-31046, pp. 37, 38/55]. On his Statement of Intention for Individuals Filing Under Chapter 7, Debtor stated his intention to surrender the motorcycle to Harley-Davidson. The was no reaffirmation agreement with Harley- Davidson filed in the Chapter 7 case, resulting in the discharge of Debtor's personal liability for the debt. 11 U.S.C. § 524(a). No party in interest sought in the Chapter 7 case to avoid Harley-Davidson's lien on the motorcycle. Nor did Harley-Davidson file a motion for relief from stay with respect to the motorcycle. The testimony at the hearing showed that Debtor had defaulted on the loan approximately two years earlier. As the Chapter 7 trustee did not administer the motorcycle, having questioned Debtor about it at the meeting of creditors according to Debtor's testimony at the hearing, it was deemed abandoned to Debtor when the case closed on September 17, 2024. 11 U.S.C. § 554(c).

Debtor testified that he filed this Chapter 13 case to save his home from a pending foreclosure due to missed mortgage payments. He lives there with his fiancé, Tonya Markham, who also testified. They have been together for 8 years. Successive Chapter 7 and Chapter 13 cases colloquially known as a Chapter 20, Debtor described the mortgage as his only debt in this case, because the Chapter 7 "cleaned the rest of

---

[1] The court takes judicial notice of the contents of its case docket. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (10th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it); *United States v. Brugnara*, 856 F.3d 1198, 1209 (9th Cir. 2017) (stating that district court may properly take judicial notice of its own records).

them out." Due to his recent discharge in the Chapter 7 case, Debtor is ineligible for a Chapter 13 discharge in this case. [Doc. ## 7, 15].

This time, Debtor did not list the motorcycle on his Schedule A/B Property. Nor did Debtor list Harley-Davidson as a creditor in this case. It does not appear on the creditor matrix and was not given formal notice by the Clerk of either the case or the plan. [Doc. ## 11, 18]. Debtor's Schedule J: Expenses do not show any monthly expense for payments on the motorcycle. The Statement of Financial Affairs in this case likewise does not show any loss of property by theft or seizure occurring in the year before filing on November 12, 2024. Debtor's yet unconfirmed Chapter 13 plan does not propose any payments to Harley-Davidson on the motorcycle, Debtor's position being that it is an unsecured debt that was discharged in his Chapter 7 case.

## B. What Happened to the Motorcycle?

Four witnesses testified at the hearing, all called by Debtor: (1) Debtor's brother Jude Schmidt; (2) Debtor's mother Barabra Schmidt: (3) Debtor; and (4) Debtor's fiancé Ms. Markham. The court admitted six exhibits; three offered by Debtor (Ex. A, the Chapter 7 case docket; Ex. B, the Chapter 7 petition and related documents filed with it; and Ex. E, Harley-Davidson's Proof of Claim No. 2-1) and three offered by Harley-Davidson (Ex. 1, the purchase contract and loan agreement; Ex. 2, an Ohio BMV title record for the motorcycle, dated March 5, 2025; and Ex. 3, a JD Powers valuation of the same model motorcycle). The court generally credits the testimony of all four witnesses, notwithstanding that three of them are closely related to Debtor in some way.

The testimony dispelled the court's skepticism going into the hearing that the motorcycle is really missing and not just being hidden by Debtor until the bankruptcy storm blows over, only to later reappear miraculously after Harley-Davidson has given up on its collateral.[2] The court is convinced that the motorcycle was stolen on July 11, 2022, that Debtor does not have possession, custody or control over it and that neither Debtor nor the other witnesses know where it is or who if anybody still has it, that is if it is intact and has not been chopped for parts.

Facts that convince the court that Debtor does not have it and does not know where it is include that he, his mother and Ms. Markham testified to his love for the motorcycle, it being akin to Debtor's and Ms. Markham's "baby." In the absence of his own motorcycle, Debtor sometimes rides his brother's

---

2 None of the documents before the court show that Harley-Davidson holds the first lien on the motorcycle, the lender and lienholder identified as Eaglemark Savings Bank, a subsidiary of Harley-Davidson Credit Corp. on the loan agreement, the title attached to the Proof of Claim and the title document dated March 5, 2025. The loan agreement provides for automatic assignment of some or all of Eaglemark's rights in the contract to Harley-Davidson under a master assignment agreement between them not in evidence. [Ex. 1, p. 4/5, ¶ 24]. Debtor has not contested Harley-Davidson's secured claim on that basis. The claim is filed on behalf of and in the name of Harley-Davidson.

3

motorcycle. Credibly, none of the witnesses have seen it since July 11, 2022, or know where it is, around his home in Sandusky, where they all gather sometimes, or otherwise. Three years would be a long time to keep it under wraps. The Proof of Claim, [Ex. E, Addendum 1], and hearing testimony also show that payments on the loan were made from its inception in June 2020, [Ex. 1, p. 1], through June 8, 2022. This is not a situation where Harley-Davidson was looking to looking to repossess the motorcycle when it went missing, removing a motive for Debtor to disappear it on purpose. Testimony also showed that the motorcycle was kept insured through Geico basically until it went missing. Nevertheless, Exhibit 2, dated as of March 5, 2025, shows that legal title to the motorcycle remains in Debtor Joshua M. Schmidt as its owner even though he does not have any present possessory interest in it.

      Harley-Davidson argues that Debtor did not act in good faith as to his obligations to it with the motorcycle as its collateral. Certainly, it argues, he breached his obligations with respect to the collateral under the loan agreement. It asserts that this conduct should be a factor the court considers in deciding whether its claim is secured, making the circumstances around disappearance of the motorcycle relevant beyond just the facts that Debtor does not have possession of it and does not know where it is.

      Debtor last had the motorcycle in July 2022, when he rode it from Sandusky to Toledo. He was working cash roofing and siding jobs in Toledo with a man named Bill to whom a friend of his named Cameron in Sandusky had alerted him. Bill, perhaps named William Fleming, whom Debtor referred to sometimes as a "friend," stayed at a house on Nebraska Avenue in Toledo, ownership of which is not shown on the record. Debtor also stayed there with the motorcycle for the couple of days he was working these cash jobs with Bill. He used it to get to job sites.

      On July 11, 2022, Debtor had to appear in state court in Monroe, Michigan, twenty miles or so north of Toledo but a couple of hours from Sandusky, on an unspecified criminal charge. That is why Debtor and Ms. Markham, not surprisingly, specifically remember that date as when the motorcycle disappeared. Debtor did not want to ride the motorcycle to court in Monroe, likely on I-75, because rain was in the forecast, and he wanted to look presentable for his court appearance. Ms. Markham drove her car from Sandusky to pick Debtor up and take him to court in Monroe. Bill said Debtor could leave the motorcycle in a garage on the property on Nebraska Avenue and that it would be fine there. News flash: it was not. Debtor put the cover on the motorcycle and put it in the garage. The garage door was shut when he left for court in Monroe with Ms. Markham. Debtor does not know whether the garage was locked. Recollections are hazy about what was done with the keys to the motorcycle when he left. That was the last time he and Ms. Markham saw the motorcycle.

4

The court appearance in Monroe went poorly. Debtor was immediately sentenced at the hearing and taken into custody, remaining in jail for four months. He did not expect to go to jail that day. In jail, he was limited as to phone calls and contact with the outside. As he was taken into custody, he asked Ms. Markham to get his motorcycle from the Nebraska Avenue property and get it back to Sandusky. She immediately drove back to Toledo to retrieve the motorcycle. It was gone when she got there. She herself did not know Bill or any of the people who stayed at the house. She knocked on the door and told Bill she was there to arrange to retrieve the motorcycle for Debtor. Bill said it was not there. Bill told her someone named Lance Carlton took the keys, told Bill that Debtor owed him $50, took the motorcycle and told Bill that when Lance got his money Debtor would get his motorcycle back. Ms. Markham looked in the garage and confirmed the motorcycle was not there, just the cover on the floor. She took the cover with her.

Ms. Markham testified that for several days she stayed with acquaintances in Toledo, beside herself that the motorcycle was missing. She drove around Toledo looking for it and went back to the house several times. Sometimes somebody would answer the door (she never talked to Bill again) and sometimes nobody would answer. She was given phone numbers at which the court infers Lance Carlton might be located and they did not work. One time, a girl answered the door and was nice to Ms. Markham. However, she would not give Ms. Markham any information and delivered an ominous message, to the effect that she should not be there because if "he" sees her there it wouldn't be good and that she needed to leave. Ms. Markham said "they were almost afraid of this person." She did speak to a police officer she saw while she was driving around Toledo on July 16, which she remembers because it was her birthday, generally about how to make a police report in Toledo. She said she was deterred from doing so because she was told Debtor as the owner would have to be the one to make it. When she was able to speak with Debtor from jail, she informed him that the motorcycle was gone when she got back to Toledo on July 11, 2022, and generally kept him apprised when she could speak to him about her efforts to find it.

Debtor testified that when he got out of jail in November 2022, he himself tried to find his motorcycle. His efforts included going to the house in Toledo where apparently Bill no longer lived, but nobody answered the door. The phone number he had for Bill was disconnected. He tried to contact Bill through Facebook and mutual contacts, but they could not find him either. He acknowledges it is possible that Bill stole the motorcycle. Debtor, however, also never filed a police report, testifying unconvincingly about why he did not. Nor did he ever make an insurance claim on the motorcycle or contact Harley-Davidson to report it stolen.

The court's view of the evidence is that Debtor was disinclined to make formal waves about the theft of his motorcycle, whether to Toledo police, Geico Insurance or Harley-Davidson. The court believes

5

that he and Ms. Markham tried to find it on their own. However, raising more formal claims and making written reports about its disappearance, based on Ms. Markham's convincing testimony about the warning to her to stay away, might also result in more formal efforts to find it when it appears Debtor had reason to worry about repercussions from whoever took it. The record does not show the nature of the criminal charges Debtor faced in Michigan. Nor did he mention or was he asked about Lance Carlton at the hearing, perhaps just as well. He testified prior to Ms. Markham and was not recalled to the stand. It is not a stretch, however, to infer that Debtor had contact with some less than upstanding citizens in that time frame that best be left in the rear-view mirror from certain perspectives. The question is whether these lackluster efforts to formally and promptly report the motorcycle theft are relevant in deciding its value for purposes of determining whether Harley-Davison has a secured claim in this Chapter 13 case.

In summary, as of commencement of this Chapter 13 case, Debtor has legal title to the motorcycle but has no possessory interest in it and does not know where it is. Harley-Davidson has a continuing lien on the motorcycle that it is entitled to enforce against it on an *in rem* basis if it is found, Debtor's *in personam* liability for the debt discharged in his Chapter 7 case. In other words, if it does not have a secured claim, Harley-Davidson will not receive any distribution on its claim in this Chapter 13 case.

## II. LAW AND ANALYSIS

The only issue before the court is the value of Harley-Davidson's collateral. The valuation of a creditor's collateral is controlled by 11 U.S.C. § 506(a), which provides in relevant part that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest…is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property…." Valuation under § 506(a) is context-specific, as "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing…on a plan affecting such creditor's interest." Where, as here, the debtor is an individual in a case under Chapter 13, the valuation inquiry is refined in paragraph (2) of § 506(a): "such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing." In turn, § 506(a)(2) defines replacement value of personal property acquired for personal, family or household purposes, as the motorcycle was, as "the price a retail merchant shall charge for property of the kind considering the age and condition of the property at the time value is determined."

Under Bankruptcy Rule 3012(b)(1), captioned "Determining the Amount of a Secured or Priority Claim," a request to determine the amount of a secured claim may be included in an objection to claim, as Debtor has filed. In this context, the court finds that Debtor bears the burden of proof on the value of

6

the motorcycle as Harley-Davidson's collateral. *See In re Wcislak,* 417 B.R. 24, 28 (Bankr. N.D. Ohio 2009) (Judge Speer). *But see In re Northstar Offshore Grp., LLC,* Case No. 16-34028, 2024 WL 4177957, at *3 (Bankr. S.D. Tex. Sept. 12, 2024).[3] As Harley-Davidson argues, Debtor is trying to cram down the secured claim to zero. It is his burden to do so.[4]

When debtor commenced his Chapter 13 case, "all legal or equitable interests of the debtor in property" became property of the bankruptcy estate. 11 U.S.C. § 541(a). A debtor is not required to have a possessory interest in property at commencement of the case for it to become property of the bankruptcy estate. *U.S. v. Whiting Pools,* 462 U.S. 198, 205 (1983). As broad as § 541(a) is, the definition is not unlimited. The debtor must first have an interest in the property. Whether he does depends on state law. *Butner v. United States,* 440 U.S. 48, 54-55 (1979).

The court finds that Debtor and therefore the bankruptcy estate has an interest in the collateral even though it is missing and Debtor does not have it. The Ohio Bureau of Motor Vehicles Title Record for the motorcycle, [Ex. 2], shows that as of March 5, 2025, legal title to the motorcycle remains in Joshua M. Schmidt as the owner. Title Status is described on Exhibit 2 as Active. *See* Ohio Revised Code § 4504.04; *In re Wyman*, 626 B.R. 480 (Bankr. S.D. Ohio 2021) (to show ownership of a motor vehicle in Ohio, an individual's name generally must be on the certificate of title). *Cf.* Ohio Revised Code § 4505.11(A) (surrender or cancellation of certificate of title). Debtor's legal title interest in the motorcycle is thus property of the estate, notwithstanding that Debtor failed to schedule it on his Schedule A/B in this case. *See In re Chatham*, 2023 WL 2637275, at * 4 (Bankr. N.D. Miss. March 24, 2023) (Debtor, under state law, and thus the bankruptcy estate still has a property interest in a missing car that remains titled in the debtor's name).

Debtor does not contest that Harley-Davidson has a perfected lien on the motorcycle to secure its debt, the amount of which has not been contested. And while its debt has been discharged in the prior Chapter 7 case and is no longer collectible from Debtor as *in personam* obligation, its lien on the collateral

---

[3] Section 506(a) does not set a burden of proof to establish value of a creditor's collateral. Courts use different approaches. The court in *In re S-Tek, LLC,* Case No. 20-12241-j11, 2022 WL 2133975, at *9-*11 (Bankr. D. New Mex. June 13, 2022), a Chapter 11 case, discusses three general approaches used by courts: (1) burden of proof on the secured creditor; (2) burden of proof on the party seeking to value the claim, usually the debtor; and (3) a presumption of prima facie validity and burden shifting approach derived from the claims allowance process. This court is of the view that the burden shifting method as to collateral value in a proof of claim improperly conflates claim allowance under 11 U.S.C. § 502(a) and Bankruptcy Rule 3001(f) and the claims bifurcation process under § 506(a) and Bankruptcy Rule 3012. *See In re Bauer,* 660 B.R. 649, 658-59 (Bankr. N.D. Ohio 2024) (Judge Gustafson). In this context, the court finds that the burden of proof most logically rests with the Debtor, as the party requesting relief and in the best position to address the value of the estate's interest in the collateral from the perspective of its use and disposition under the plan he proposes.

[4] Alternatively, if Harley-Davidson has the burden of proof on the value of the motorcycle, it has not met its burden. *See In re Jorge Valls,* Case No. 09-35347-BKC-LMI, 2010 WL 2745951, at *2 (Bankr. S.D. Fla. July 6, 2010) (In Chapter 13 case, "[r]egardless of whether the Debtor or Wells Fargo Bank had the burden of proof on the issue of value…the Court finds that the Debtor has met its [sic] burden and that Wells Fargo has not….").

was not affected by the Chapter 7 case and remains *in rem* obligation collectable from the motorcycle. Harley-Davidson has a lien on property in which the bankruptcy estate has an interest. *In Chatham,* 2023 WL 2637275, at *4 (Bank has secured claim in missing car titled in Chapter 13 debtor's name, necessitating amendment of his schedules to list it as property).

Debtor contends that the value of the estate's interest in the motorcycle under § 506(a) is zero, while Harley-Davidson presented evidence that the retail value of the same make and model motorcycle as Debtor's exceeds the debt, making its claim fully secured under § 506(a), [Exhibit 3]. Debtor has the better of the arguments in this case. He has sustained his burden of proof that the value of the estate's interest in the motorcycle is zero, given that the court has only two potential values to pick from based on the evidence. *See In re Elliott*, 64 B.R. 429, 430-31 (Bankr. W.D. Mo. 1986) (for purposes of determining secured claim in Chapter 13 case, value of lender's lien on missing rings taken by missing co-debtor is zero because debtor cannot wear them and a trustee could not sell them); *In re Walker*, Case No. 4:03-BK-17741E, 2003 WL 22794522, at *2 (Bankr. E.D. Ark. Oct 31, 2003) (value of estate's interest and creditor's liens in missing vans is zero for purposes of treatment of secured claim in Chapter 13 case). *But cf. In re Buffington,* Case No. 25-50021, 2025 WL 1943320, at *2 (Bankr. W.D.N.C. July 1, 2025) (car titled in Debtor's name under state title law but in possession of her father who makes the payments is property of the bankruptcy estate and should be listed on her Schedule A/B at its full value instead of at zero value, rejecting a state law resulting trust theory).

Valuation comes down to the language and criteria of § 506(a)(2). The replacement value standard in § 506(a)(2) is premised on a Chapter 13 debtor retaining personal property for personal, household and family use, the general theory being that if the debtor had to go to the retail market to acquire like property instead of keeping what he already has, the existing secured creditor should be entitled to the same value that debtor would otherwise have to pay to replace it. *See Associates Commercial Corporation v. Rash*, 520 U.S. 953 (1997). The value ascribed to the motorcycle by Exhibit 3 is indeed premised on the retail value of the same make and model bike as Debtor's. But Debtor does not propose to keep it and use it because he does not have it, indicating his intention in the Chapter 7 case to surrender it. Harley-Davidson's valuation addresses the retail value of the whole bundle of sticks that comprise the property interests in the motorcycle, both bare legal title and the possessory interest in it. But the estate does not have any possessory interest in the motorcycle. Harley-Davidson is asking the court to infer that a retail merchant selling Harley Davidson motorcycles will be able to charge the full JD Power value for bare legal title to a bike for which it cannot deliver possession. The court cannot make this factual leap under § 506(a)(2) based on the evidence. Moreover, retail value of the motorcycle under § 506(a)(2) is to be

8

based on the age and condition of the property at the time of valuation. While the age of the motorcycle is known, its condition and milage are utterly unknown, making Harley-Davidson's valuation of the whole motorcycle only hypothetical in this case.

The latter point, that the condition, location and mileage of the motorcycle are unknown, is the essence of Harley-Davidson's valuation argument. Its point is that the onus of the motorcycle having gone missing for purposes of valuing its secured claim should be on Debtor, not on it. As counsel for Harley-Davidson aptly frames the facts, her client sees Debtor playing a "shell-game" around its lien on the motorcycle from which Debtor should not benefit. It argues, accurately, that Debtor breached his obligations under the loan agreement to notify Harley-Davidson of any change in location of the motorcycle, to protect the collateral and its security interest and take action to assist in its enforcement, not to expose the motorcycle to misuse or confiscation and to keep it insured for the duration of the contract. [Exhibit 1, p. 3/5, ¶¶ 3 and 8]. Debtor's carelessness in leaving "his baby" in a garage miles away from home in the custody of a casual acquaintance of perhaps less than upstanding character and subsequent lackluster efforts to formally report the theft to the police and to make an insurance claim, which the court acknowledges, should be disqualifying of Debtor's cram-down valuation of its collateral to zero in Harley-Davidson's view.

Harley Davidson's argument has a certain attractiveness from the standpoint of fairness and equity.[5] There is case law supporting its position that arises in a variety of procedural contexts in consumer bankruptcy cases. Unsurprisingly, this is not the first case in which a lender's collateral has gone missing; courts sometimes hold or express in dicta that treatment of a creditor's secured claim in a debtor's favor should be conditioned on debtor's blamelessness to varying degrees in the disappearance.

An example of a case supporting Harley-Davidson's argument is *In re Torres,* Case No. BK-04-09913 CGC, 2005 WL 8245454 (Bankr. D. Ariz. Sept. 20, 2005). Keybank, U.S.A.'s loan to debtors was secured by a car. Debtors filed a Chapter 13 petition and initially proposed to pay Keybank's claim as secured. After the case was filed but before plan confirmation, the car was stolen. Debtors filed an amended plan proposing surrender of the car, with any deficiency balance to be discharged as unsecured. As it turns out, insurance on the vehicle lapsed post-petition when debtors stopped paying premiums because they could not afford them. Keybank objected to debtors' amended plan, arguing that surrender was illusory because the car was missing. The court noted that "no one blames Debtors for the theft of the

---

[5] The equites may not be so clear cut here because this is a "Chapter 20" case. Harley-Davidson is no worse off for Debtor having filed this Chapter 13 case to save his house. It is in the same place it would be without the filing of the Chapter 13, with a lien on the missing motorcycle that it may still enforce but with no ability to collect the debt from Debtor *in personam* due to his Chapter 7 discharge. Arguably, the Chapter 13 would be a windfall to Harley-Davidson if Debtor was required to pay its claim as fully secured due to his conduct with respect to the motorcycle.

9

vehicle….." *Id.*, at *2. Nevertheless, as Harley-Davidson argues here, "Debtors are responsible for not keeping in place insurance on the Vehicle and for not notifying the Creditor of its lapse, which would have allowed Creditor an opportunity to insure the Vehicle itself." *Id.*

The court in *In re Torres* distinguished two other missing collateral Chapter 13 cases, *In re Gabor*, 155 B.R. 391, 394 (Bankr N.D. Va. 1993) (surrender under Chapter 13 permissible because debtor's ex-wife took off with their car that was creditor's collateral and he could not obtain possession of it) and *In re Gilsinn*, 224 B.R. 710 (Bankr. E.D. Mo. 1997) (lender did not have a secured claim in Chapter 13 case where car that was its collateral and titled in debtor's name was left with his former company, he and his former colleagues pointed fingers at each other as to who had it but debtor, credibly, did not have it despite using his best efforts to find it and did not know where it was). The common thread in *In re Gabor* and *In re Gilsinn* for the court in *In re Torres* "was that the debtor was without blame in the disappearance of the creditor's collateral, a factor both courts considered." *In re Torres,* 2005 WL 8245454, at *2. The court in *In re Gilsinn* "distinguish[ed] this case from those where debtors have hidden estate assets, been less than forthright with the court or failed to offer their best efforts to locate missing collateral." *Id,* quoting *In re Gilsinn,* 224 B.R. at 713.

In distinguishing *In re Gabor* and *In re Gilsinn,* the court in *In re Torres* cast blame on debtors as "ultimately responsible for the Creditor's loss of its security," with the insurance lapse "not accidental," leaving the creditor without effective means of protecting its collateral. *In re Torres*, 2005 WL 8245454, at *2. The bottom line was that the court sustained creditor's objection to confirmation as it pertained to debtors' treatment of its claim as unsecured "because it would be inequitable to hold otherwise." *Id*.

The court is not persuaded by missing collateral cases such as I*n re Torres* that condition treatment of a creditor's claim on the degree of a debtor's blamelessness for the disappearance. That factor does not find a home in the language of § 506(a) defining what makes a claim secured or unsecured in a bankruptcy case. The court in *In re Torres* was upfront in acknowledging that its decision was grounded in equity. Thus, it does not explain what debtors' decision to let their car insurance lapse, as Debtor did here as well, has to do with the language of the statute around defining a secured claim or surrender as proper treatment of a secured claim under § 1325(a)(5)(C). Nor do *In re Gilsinn* or *In re Gabor,* the latter otherwise closely similar to this court's analysis, explain why the outcome should be different under the statute if, as here, the debtor had been less than diligent in working with the secured creditor to protect the collateral and find it after its theft. There are other Bankruptcy Code situations under Chapter 13, such a arguing a petition is filed in bad faith or a plan is not proposed in good faith, or under Chapter 7, where dischargeability considerations might be advanced, *see Nuvell Credit Corp. v. Ross (In re Ross)*, 359 B.R.

690 (Bankr. N.D. Ill. 2007), in which a debtor's conduct around a creditor's collateral would be relevant. Those are not issues before the court on Debtor's Objection.

Nor have the concepts of general equity and fairness as relevant considerations under specific sections of the Bankruptcy Code aged well in the eyes of the Supreme Court, as "'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." *Law v. Siegel,* 571 U.S. 415 (2014), quoting *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206 (1988); *see In re Smith,* 999 F.3d 452, 456 (6th Cir. 2021)(Supreme Court in *Law v. Siegel* "flatly rejected the idea that § 105(a) vests in the bankruptcy courts equitable power to disregard the Code's provisions when they lead to results that seem unfair").

Based on the foregoing reasons and authorities,

**IT IS ORDERED** that Debtor's Objection to Proof of Claim Filed by Harley-Davidson Credit Corp. (Claim No. 2) [Doc. # 20] is **GRANTED**. The value of Harley-Davidson Credi corporation's secured claim in this Chapter 13 case is zero.

# # #